## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ADAM REYNOLDS,

Plaintiff,

vs.

JULIE L. JONES, in her official capacity as Secretary of the Florida Department of Corrections; and CENTURION OF FLORIDA, LLC., a Florida limited liability corporation,

Defendants.
_____/

CASE No: 6:18-CV-1756-ORL-37GJK

JURY TRIAL DEMANDED

## **AMENDED COMPLAINT**

Plaintiff, ADAM REYNOLDS ("Plaintiff" or "Reynolds"), by and through undersigned counsel, hereby files this Complaint, against the Defendants as follows:

## **PARTIES**

1. Plaintiff is a citizen of the State of Florida, presently residing St. Lucie County, Florida, and who was incarcerated at all relevant times in the Central Florida Reception Center, in Orlando, Florida, located in Orange County, Florida, and operated by the Florida Department of Corrections.

2. Defendant, JULIE L. JONES, in her official capacity, is the Secretary of the Florida Department of Corrections (FDOC). As such, she is responsible for the overall operation of the FDOC, including the operation of prison facilities. Defendant Jones has a non-delegable duty to provide constitutionally adequate medical care to all persons in her custody. She is sued in her official capacity for injunctive and declaratory relief.

3. Defendant, CENTURION OF FLORIDA, LLC., is a Florida limited liability corporation, with is principal place of business located in St. Louis, Missouri. Since approximately September 2016, Centurion has contracted with the FDOC to provide medical and mental health care services to all persons confined in the majority of FDOC prisons, including the Central Florida Reception Center.

4. Defendants are responsible for the operation of Utilization Management (UM), the body at the FDOC which approves or denies certain medical care.

5. The actions of the Defendants and their agents were performed under color of state law and constitute state action.

## JURISDICTION and VENUE

6. Jurisdiction of this Court is invoked pursuant to 28 USC § 1331, in that this is a civil action arising under the Constitution of the United States.

7. Jurisdiction of this Court is invoked pursuant to 28 USC § 1343(a)(3), in that this action seeks to redress the deprivation, under color of state law, of rights secured to the Plaintiff by the Constitution and laws of the United States.

8. Plaintiff's claims for relief are predicated, in part, upon 42 USC § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 USC § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions brought under 42 USC § 1983.

9. Venue is proper in this district pursuant to 28 USC § 1391(b) and § 1391(c), as Defendants do business in this judicial district and division, and many of the events or

omissions giving rise to the cause of action occurred in this judicial district and division.

10. [Omitted].

## PRELIMINARY STATEMENT REGARDING NATURE OF ACTION

11. In 2015, a class action was filed against the FDOC and its then existing health care provider, Corizon, regarding a policy of those defendants of denying surgery to inmates with inguinal hernias.

12. The class action was captioned <u>Copeland v. Jones, et als.</u>, Case # 15-CV-00452-RH-CAS, Northern District of Florida.

13. The action proceeded as a class action under Rule 23, Federal Rules of Civil Procedure.

14. A Motion to Certify the Class was filed with the Court on December 23, 2015. A Consent Order Upon Joint Motion To Certify Class was entered by the Court on September 23, 2016. A Motion to Approve Settlement was filed with the Court. A Consent Order was entered on September 23, 2016. The Order Finally Approving The Settlement was entered on September 11, 2017.

15. Essentially, the <u>Copeland</u> action alleged a policy, practice, and custom of the defendants FDOC and Corizon of not provided needed surgeries to incarcerated people who suffer from painful hernias, except in emergency situations.

16. The <u>Copeland</u> action alleged that hernias can be extremely painful and debilitating, and if left untreated, can lead to infection, bowel obstruction, and even death. It was further alleged that despite the fact that surgical repair is the only way to prevent such negative outcomes, the defendants had a policy of refusing to provide hernia surgeries, except in emergency situations.



*Law Offices Of*
**Stuart M. Address, P.A.**
Website: stuartaddresslaw.com
Office: (772) 781-8003 Fax: (772) 781-8005
**611 S.W. Federal Highway, Suite A, Stuart, Florida 34994**

17. It was further alleged that the primary motive was to reduce costs and increase profits.

18. Indeed, it was alleged that the policy prohibits medical staff from exercising medical judgment and has resulted in the denial of surgeries to dozens, if not hundreds of hernia patients, leaving them in severe pain, unable to participate in normal activities, and at risk for further complications.

19. Finally, it was alleged that the policy and practice constituted the wanton infliction of pain and amounted to the deliberate indifference to the serious medical needs of those incarcerated within the FDOC system, in violation of the Eighth Amendment to the United States Constitution.

20. As a result of the settlement, the end date of the class in the Copeland action was May 2016.

21. Plaintiff, REYNOLDS, herein incorporates by reference the above allegations from the Copeland action as his own.

**AN OVERVIEW OF PLAINTIFF, REYNOLDS, ALLEGATIONS**

22. In September 2016, the FDOC was clearly vested with a heightened awareness of the hernia issue.

23. Indeed, effective September 1, 2016, the FDOC terminated its agreement all remaining aspects of its agreement with Corizon to provide health services for inmates. These services were now fully transitioned to Centurion, which had entered into a contract with the FDOC, dated January 29, 2016, effective February 1, 2016.

24. Despite the FDOC's heightened awareness and agreement with regard to how hernias would be handled prospectively, it treated Mr. Reynolds hernia in the same manner which

led to the Copeland class action.

25. In September 2016, **at the same time as a Consent Order was executed in the Copeland class action proscribing the terms of settlement,** the FDOC and its new health care provider, Centurion, continued its prior policy of denying hernia surgery where indicated – and where recommended by medical providers.

26. In September 2016, based upon the medical records obtained from the FDOC, it is clear that Mr. Reynold's complained about pain which was referenced as an "inguinal hernia descended to testicular area."

27. During September 2016, a hernia belt was provided to Mr. Reynolds and he was scheduled for an ultrasound.

28. During late September 2016, the results of tests undertaken by radiology resulted in a finding of a "left inguinal hernia - 1 yr. duration, extending into testicular sac for last 7 days."

29. The ultrasound findings were of a "Left inguinal hernia. There is likely a hernia with bowel loop in the left inguinal canal with calsalva maneuver."

30. In early October 2016, Mr. Reynolds was authorized for a "specialty evaluation". However, the evaluation was not scheduled until late January 2017 – 3 ½ months later.

31. As a result of a sick-call report in late January 2017, prior to the evaluation, it was noted that Mr. Reynolds was suffering from "severe pain, non-reducible hernia."

32. This is precisely the type of hernia in which the FDOC was to have a new protocol to ensure proper medical care as a result of the settlement in the Copeland class action.

33. On January 31, 2017, a consultant's report recommended surgery. The report noted, "Recommendation : Left inguinal hernia repair with mesh."

34. In mid-February 2017, Mr. Reynolds followed up with a request regarding the status of scheduling surgery. As a result, there is a note contained in Mr. Reynolds' medical records which provides as follows: "Having pain while working in kitchen from the hernia. Has been seen by the surgeon who recommends surgery to repair the hernia."

35. Again, despite the recommendation in January and the follow-up notation of same in February, no surgery was ever scheduled.

36. In April 2017, Mr. Reynolds was released from FDOC custody.

37. Thereafter, in the week following his release, on April 10, 2017, Mr. Reynolds went to a private medical provider for a consultation with reference to his hernia.

38. The private medical provider advised that immediate surgery was necessary to avoid potential permanent injury.

39. The surgery was performed at Lawnwood Regional Medical Center, on May 16, 2017.

40. The FDOC and Centurion clearly recognized that Mr. Reynolds suffered from a hernia requiring intervention as early as September 2016; when it was settling the Copeland class action arising from the same complaint as is now made by Mr. Reynolds.

41. The FDOC and Centurion still chose not to take the issue of hernias seriously.

42. In Mr. Reynold's situation, despite various tests, it deferred any surgical consult until late January 2017 – almost 5 months after the initial complaints.

43. Moreover, despite receiving a clear written report recommending the need for surgery in January 2017, the FDOC and Centurion failed to act.

44. When the reference for the need for surgical intervention was reiterated in February 2017, the FDOC and Centurion again took no action.

45. Upon information and belief, the failure to act, consistent with the history of the FDOC and Corizon, resulting in the <u>Copeland</u> class action settlement, represented a continuation of the deliberate indifference by FDOC and its new health care provider to the seriousness of hernias; particularly those wherein surgery was clearly recommended.

46. The only rational alternative explanation, which would similarly constitute a violation of the Eighth Amendment, was that the Defendants chose to defer surgery knowing that Mr. Reynolds was scheduled for release in April 2017. If so, the Defendants acted in a knowing and willful denial of necessary medical care with a profit motive the sole possible reasonable explanation.

## GENERAL ALLEGATIONS RELATING TO HERNIAS
## AND
## DEFENDANTS' POLICY RELATING TO HERNIA SURGERIES

*<u>Hernias</u>*

47. A hernia occurs when an organ or other tissue is forced through a weak spot in the abdominal wall. An inguinal hernia occurs when contents of the abdomen—including intestines and fat—bulge through a tear or weakness in the groin area (where the lower abdomen meets the inner thigh). The tissue may recede back into the abdomen and then bulge out again, depending on the patient's position and activity.

48. Inguinal hernias are the most common type of hernia. In men, inguinal hernias can cause internal tissue to be forced into the scrotum, pressing on the testicles and causing severe pain.

49. Groin hernias (i.e., inguinal and femoral hernias) are very common—the prevalence of groin hernias has been estimated to be between 5 and 10 percent in the United States, with

inguinal hernias accounting for the vast majority. The estimated lifetime risk of developing a groin hernia is about 25 percent in men.

50. Inguinal hernias cause severe pain, which typically worsens with activity or exertion. Routine and necessary activities such as walking, running, lifting, coughing, urinating, defecating, and even sitting up can cause the tissue to bulge out of the abdominal wall, causing intense and excruciating pain. Hernias can be so painful that they prevent people from engaging in any activities, forcing patients to be bedridden. Other symptoms of inguinal hernias include weakness, feelings of heaviness, burning, tearing, or aching in the groin; or a swollen or enlarged scrotum. If left untreated, a hernia can lead to serious complications, including the intestines becoming trapped in the scrotum or the abdominal wall, which can lead to bowel obstructions, tissue necrosis, sepsis, the excision of intestines, and even death.

51. There is no connection between the size of the hernia and the amount of pain it produces. That is, smaller hernias can be just as painful, or more so, than larger hernias.

51. A hernia wherein the bulging tissue can be pushed back into place is a *reducible* hernia. Many times, however, the bulging tissue will become trapped and cannot be pushed back into place—this is a *non-reducible* or *incarcerated* hernia. Reducible hernias can be just as painful (or more so) than non-reducible hernias. Many hernias are reducible at times and non-reducible at others. A reducible hernia can become permanently non-reducible and incarcerated at any time.

52. A prisoner with a hernia who is expected to walk and stand in straight lines on the prison compound cannot simply lie down on the ground to push his intestines back into place whenever the hernia bulges out of his abdominal wall.



*Law Offices Of*
**Stuart M. Address, P.A.**
Website: stuartaddresslaw.com
Office: (772) 781-8003 Fax: (772) 781-8005
**611 S.W. Federal Highway, Suite A, Stuart, Florida 34994**

53. If an incarcerated hernia is untreated, it can become *strangulated*, meaning the blood supply to the bulging tissue is cut off, causing the tissue to die. This is an emergency situation requiring immediate surgery. Failure to treat a strangulated hernia can lead to severe infection, intestinal obstruction, the excision of intestines, and death.

54. A hernia is typically diagnosed with a physical exam and patient history. Imaging tests (such as an X-ray, CT scan, or ultrasound) may be helpful, but these scans may not detect an abnormality, especially if the bulging tissue is receded into the abdomen during the scan. Thus, a negative scan does not mean that no hernia is present.

55. The only treatment for an inguinal hernia is surgical repair. Without surgery, the tear or weakness in the abdominal wall will never heal, and the patient will continuously suffer from intense pain, discomfort, and limited activity; as well as the risk of infection, intestinal obstruction, and death. The risk of developing complications increases as more time elapses without treatment.

56. Thus, the proper treatment for a hernia begins with referral to a surgeon for a surgical consultation. The generally accepted medical practice for a patient with a hernia is to perform surgery if the patient is symptomatic; that is, experiencing pain, an inability to walk, an inability to work or engage in other normal life activities, or other symptoms.

57. A "hernia belt," truss, jock strap, or other binding options are not treatment for hernias. They are often unhelpful, do nothing to treat the condition, and can actually be harmful.

58. The medical standard of care for a patient with a symptomatic hernia is surgical repair as soon as possible after detection. Basing the decision to perform surgery on whether the hernia is reducible, irrespective of other symptoms, falls far below accepted medical practice

and the standard of care.

59. Surgery to repair inguinal hernias is one of the most common surgeries performed in the United States. It is a relatively simple procedure. More than 1 million abdominal wall hernia repairs are performed each year in the United States, with inguinal hernia repairs constituting nearly 770,000 of these cases.

60. The classification of a surgery as "elective" has no bearing on whether the condition it will alleviate is a serious medical need. Any procedure that it not an emergency can be classified as elective; this does not mean that failure to perform it will not result in severe pain and other serious complications.

### *FDOC and Centurion of Florida's Unlawful Policy of Denying Hernia Surgeries*

61. People incarcerated within the FDOC system are completely dependent upon Defendants to provide them with medical care. Prisoners are not free to seek their own care, even if they can pay for it.

62. In general, the delivery of medical care within the FDOC is supposed to work in the following manner. If a prisoner has a medical issue, he can access sick call, where he usually sees a nurse. The nurse can refer the prisoner for an appointment with the institution physician. If the physician believes a consult with a specialist is needed, the physician can request a consultation. That request is forwarded to Utilization Management (UM) in Tallahassee, which is controlled by Defendants. UM can either approve or deny the request. If the request is approved, the prisoner is sent to the specialist. Then the process repeats itself: If the specialist feels a certain procedure is needed, the specialist submits a consult report to UM requesting the procedure. If approved, the procedure is scheduled at some point in the

future.

63. UM is in effect the "gatekeeper" and makes the final determination whether medical care will be provided. UM's decision is often made by someone who is not a specialist in the area at issue, and usually without ever seeing the patient or first consulting with the prison physician.

64. Rather than making decisions based on medical judgment, however, Defendants make health care decisions based on costs, in a way that prevents medical professionals from exercising medical judgment in deciding what treatment to provide and when it should be provided. That decision-making is illustrated by Defendants' approach to patients with hernias. Specifically, Defendants have a policy, practice, and custom of not providing hernia surgeries to prisoners except in emergency circumstances. One facet of this policy is that Defendants do not provide surgery if the hernia has been reducible at any time, no matter what symptoms (including pain), the patient is experiencing. The "emergency circumstances" exception is narrow and allows surgery only in life-threatening situations, with no regard for the pain or debilitation that the patient is experiencing.

65. Thus, when someone presents with a painful hernia, one of several things happen: (a) the institution physician refuses to submit a consult request for the patient to see a general surgeon for surgical evaluation, or (b) the institution physician submits the request, which is then denied by UM, or (c) the consult request is granted, but after the surgeon recommends surgery, the surgery is denied by UM. All of these actions are taken pursuant to Defendants' policy.

66. To make matters worse, every time a patient is seen at sick call, he or she is charged a



*Law Offices Of*
**Stuart M. Address, P.A.**
Website: stuartaddresslaw.com
Office: (772) 781-8003 Fax: (772) 781-8005
**611 S.W. Federal Highway, Suite A, Stuart, Florida 34994**

$5 copayment, regardless of whether treatment is eventually provided.

## GENERAL FACTS WHICH WOULD ENTITLE PLAINTIFF TO PUNITIVE DAMAGES AGAINST CENTURION

67. Centurion has enforced this policy, practice, and custom despite knowing that failing to provide these surgeries will lead to prisoners being left in excruciating pain, limited in their activities, and at risk for serious complications or death. Centurion acted with deliberate indifference to the serious medical needs of people incarcerated in the FDOC system.

68. Centurion's actions were willful, subjecting them to punitive damages.

69. Centurion is the successor to Corizon as the medical care provider for the FDOC. In a pending class action in the Northern District, Hoffer v. Jones, the Court issued a preliminary injunction against the FDOC and Corizon in connection with inmates with HCV (Hepatitis C Virus) who were being denied medical care. The described actions of Corizon in the Court's Order granting the motion for preliminary injunction appear similar to those inflicted upon Plaintiff who was denied medical care for his hernia, and other inmates who were part of the prior referenced hernia class action.

70. In its Order, the Court found that the FDOC/Corizon had a "long and sordid history" of denial of medical care relating to HCV. The Court found that the Plaintiffs had a substantial likelihood of success on the merits in showing a serious medical need, deliberate indifference to the needs of the inmates, and causation.

71. The Court found that "there is no question that Defendant has knowledge or a risk of serious harm." The Court found that that there was "no doubt that without a court ordered injunction FDC is unlikely to treat inmates in a constitutionally appropriate manner." It found

that the FDOC "had been deliberately indifferent to the … serious medical needs." It found that if "these inmates are not treated, they will undoubtedly suffer irreparable injury." These findings relating to the FDOC were predicated upon the care provided by its contracted medical care provider, Corizon.

72. The findings of the Court in the <u>Hoffer</u> class action, relating to HCV, are similar to the conditions imposed upon Plaintiff, and those imposed upon other inmates for which the FDOC settled a class action against it last year. Centurion's ongoing pattern of deliberate denial of medical care, as the successor medical care provider to Corizon for the FDOC, is sufficient to expose Centurion to punitive damages.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983
### (CENTURION - VIOLATION OF THE EIGHTH AMENDMENT)

73. Plaintiff herein incorporates by reference the allegations contained in paragraphs 1-73, inclusive, as if fully set forth herein.

74. Centurion was a policymaker in connection with the medical care it provided to inmates of the FDOC under contract.

75. Centurion knew of the named Plaintiff's serious medical needs (including his severe pain, debilitation, and increased risk of serious complications), yet Centurion intentionally failed to provide and intentionally delayed treatment that will address those serious medical needs, knowing that their actions have resulted, in Plaintiff's continued suffering. It was only Plaintiff's release that led to the surgical resolution of his hernia.

75A. Upon investigation, Plaintiff in good faith believes that Centurion had a policy,

practice, or procedure whereby it would deny surgical procedures to inmates who were scheduled for release from incarceration within a few months so as to save on the expense of such health care. Such a policy, practice, or procedure would similarly violate the 8th Amendment rights to these inmates to adequate medical care.

76. Thus, Centurion has caused the wanton infliction of pain upon FDOC prisoners, and have exhibited deliberate indifference to the serious medical needs of Plaintiff in violation of the Eighth Amendment.

75. By denying Plaintiff his medically needed hernia surgery, Centurion imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

76. Centurion's denial of Plaintiff's medically needed hernia surgery violates all standards of decency, contrary to the Eighth Amendment.

77. Centurion's actions and "treatment" with respect to Plaintiff's hernia is medical care so cursory as to amount to no medical care at all.

78. [Omitted].

## COUNT II
## 42 U.S.C. § 12131 et. seq.
## (JULIE JONES Violation Of Americans With Disabilities Act)

79. Plaintiff herein incorporates by reference the allegations contained in paragraphs 1-73, inclusive, as if fully set forth herein.

80. This count is brought under Title II of the Americans with Disabilities Act (ADA), 42. U.S.C. § 12101 et. seq., and 42 U.S.C. § 12141-12134, and its implementing regulations.

81. Defendant FDOC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

82. Plaintiff had a type of hernia while incarcerated which is a physiological disorder or condition that affects one or more body systems.

83. The physical impairment substantially limited one or more major life activities, including but not limited to, walking, bending, lifting, eating, concentrating, thinking, communicating, etc.

84. Plaintiff had a history of the impairment while in FDOC's care and custody.

85. Plaintiff was regarded by FDOC as having an impairment that substantially limits one or more major life activities, as FDOC perceives him to have such an impairment.

86. FDOC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

87. Plaintiff is a qualified and eligible individual because he met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the FDOC, including but not limited to medical services.

88. By withholding medical services, i.e. the recommended surgery for Plaintiff's hernia, the FDOC excluded Plaintiff from participation in , and denied him the benefits of FDOC services, programs, and activities by reason of his disability.

89. Plaintiff was denied equal access and enjoyment of effective medical services.

90. In so doing, the FDOC subjected Plaintiff to discrimination.

91. The FDOC utilized criteria or methods of administration of medical services which had the effect of subjecting Plaintiff to discrimination and that defeat or substantially impair accomplishment of the objectives of medical treatment.

92. The FDOC knew about its violations herein but continually failed, even after settlement

of the referenced class action, to correct its violations with respect to Plaintiff, thereby exhibiting deliberate indifference to the rights of Plaintiff.

93. As a direct and proximate cause of these actions and omissions, Plaintiff has suffered from harm and violation of his ADA rights.

## COUNT III
## 29 U.S.C. § 791-794a
## (JULIE JONES Violation Of the Rehabilitation Act)

94. Plaintiff herein incorporates by reference the allegations contained in paragraphs 1-73, inclusive, as if fully set forth herein.

95. This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701 et seq., and 29 U.S.C. § 791-794, et seq., and its implementing regulations.

96. The FDOC is a program or activity receiving federal financial assistance.

97. The FDOC excluded Plaintiff from participation in, and denied him the benefits of programs or activities, solely by reason of his disability.

98. The FDOC subjected Plaintiff to discrimination.

99. The FDOC denied Plaintiff the opportunity accorded others to participate in programs or activities.

100. The FDOC utilizes criteria or methods of administration that either purposefully or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of the FDOC's programs or activities with respect to disabled persons.

101. The FDOC has known about its violations but has failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

102. As a direct and proximate cause of this exclusion, Plaintiff suffered from harm and violation of his rights under the Act.

## PRAYER FOR RELIEF AS TO ALL COUNTS

WHEREFORE, Plaintiff demands the following relief:

    A.    A judgment declaring that Centurion has exhibited deliberate indifference to the serious medical needs of Plaintiff and has violated Plaintiff's right to be free from Cruel and Unusual Punishment, as secured by the Eighth and Fourteenth Amendments to the Constitution;

    B.    An award of nominal and compensatory against Defendants, as appropriate;

    C.    An award of punitive damages against Centurion.

    DC.    An award of Plaintiffs' attorneys' fees, expenses and costs of suit; and

    E.    Such other relief as the Court may deem equitable and just under the circumstances.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury as to all issues so triable.

 

    Stuart M. Address, Esq. (FBN 989606)
    stuart@stuartaddresslaw.com
    **Law Offices of Stuart M. Address, P.A.**
    611 S.W. Federal Highway, Suite A
    Stuart, Florida 34994
    Telephone:   (772) 781-8003
    Facsimile:   (772) 781-8005
    Counsel for Plaintiff

Dated: January 23, 2019



*Law Offices Of*
**Stuart M. Address, P.A.**
Website: stuartaddresslaw.com
Office: (772) 781-8003 Fax: (772) 781-8005
**611 S.W. Federal Highway, Suite A, Stuart, Florida 34994**